**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMANE SOCIETY INTERNATIONAL,<br>1255 23rd Street NW, Suite 450,<br>Washington, DC 20037,<br><br>THE HUMANE SOCIETY OF THE UNITED STATES,<br>1255 23rd Street NW, Suite 450,<br>Washington, DC 20037,<br><br>*and*<br><br>CENTER FOR BIOLOGICAL DIVERSITY,<br>378 North Main Avenue,<br>Tucson, AZ 85701,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEBRA HAALAND, *in her official capacity as Secretary of the Interior*,<br>U.S. Department of the Interior,<br>1849 C Street NW,<br>Washington, DC 20240,<br><br>*and*<br><br>U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street NW,<br>Washington, DC 20240,<br><br>*Defendants*. | Case No. 21-2945 |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

### INTRODUCTION

1.    Plaintiffs Humane Society International, the Humane Society of the United States, and Center for Biological Diversity (collectively "Plaintiffs") challenge the failure of Secretary of

the Interior Debra Haaland and the U.S. Fish and Wildlife Service (collectively "the Service" or "Defendants") to (1) make a required 12-month finding under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, on Plaintiffs' July 25, 2016 petition to reclassify all leopards (*Panthera pardus*) as endangered (hereinafter "Uplisting Petition"), and (2) respond to Plaintiffs' July 25, 2016 petition to require ESA permits for threatened leopards' importation as hunting trophies by rescinding the existing 4(d) rule for threatened leopards, 50 C.F.R. § 17.40(f)(2) (hereinafter "4(d) Petition") (collectively with Uplisting Petition, "Petitions").

2.      Under the ESA, the Service is required to list imperiled species as either "threatened" or "endangered," as appropriate. 16 U.S.C. § 1533(a). Certain protections automatically apply to endangered species. *Id*. § 1538(a). The Service may extend some or all of those protections to threatened species but must craft rules that are "necessary and advisable to provide for the conservation of such species," by creating a "4(d) rule" specific to the species. *Id*. § 1533(d).

3.      Leopards are currently listed as endangered under the ESA throughout their range, except in certain parts of Africa where they are listed as threatened. 50 C.F.R. § 17.11(h). The 4(d) rule for threatened leopards carves out an exemption for imports of African leopard hunting trophies so that an ESA permit is not required to bring such trophies into the United States. *Id*. § 17.40(f)(2).

4.      The ESA requires the Service, upon receiving a citizen petition to list or reclassify a species, to make an initial finding within 90 days regarding whether the petitioned action "may be warranted" ("90-day finding"). 16 U.S.C. § 1533(b)(3)(A). If the Service issues a positive 90-day finding, the ESA requires the Service to find whether listing "*is* warranted" within 12 months of receiving the petition ("12-month finding"). *Id*. § 1533(b)(3)(B) (emphasis added).

5.      On November 30, 2016, the Service made a positive 90-day finding on Plaintiffs'
Uplisting Petition. Endangered and Threatened Wildlife and Plants; 90-Day Findings on Three
Petitions, 81 Fed. Reg. 86,315, 86,317 (Nov. 30, 2016); *see also* Endangered and Threatened
Wildlife and Plants; 90-Day Findings for Five Species, 82 Fed. Reg. 60,362, 60,365 (Dec. 20,
2017) (correcting errors in prior notice). However, the Service has failed to make the required 12-
month finding on the Uplisting Petition, which is now long overdue.

6.      Compliance with the ESA's mandatory 12-month deadline is necessary to help
ensure the continued survival of leopards currently classified as threatened, which have likely
undergone a 30% population decline in recent years and face numerous threats. Even though
leopards receive the strictest protections available under the Convention on International Trade in
Endangered Species ("CITES"), these protections have proven insufficient to protect the species.
Unscientific quotas and lax applications of CITES' import and export requirements have allowed
poorly regulated trophy hunting of African leopards—driven in large part by U.S. hunters—to
reach unsustainable levels, risking the species' survival. Additional ESA protections are needed to
curb the harm U.S. trophy hunting is causing to African leopards. Even if properly implemented,
CITES can only ensure that the trophy trade is *not detrimental* to the species' survival, while the
requested ESA protections mandate a more comprehensive and stringent showing that trophy trade
actually *enhances* the survival of the species.

7.      The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706,
requires that agencies give "an interested person the right to petition for the issuance, amendment,
or repeal of a rule," *id.* § 553(e). The Service also has regulations that provide for such petitions,
50 C.F.R. § 424.14, including to "adopt or modify" 4(d) rules that apply to threatened species, *id.*
§ 424.10. The APA requires the agency "to conclude a matter presented to it" "within a reasonable

time," and it must provide "prompt notice" of any decision to deny a petition. 5 U.S.C. § 555(b), (e). If the agency fails to act, any person "suffering legal wrong" or "adversely affected or aggrieved" has a cause of action under the APA. *Id.* § 702; *see also id.* § 551(13) (including failure to act in definition of "agency action"). Although more than five years have passed since Plaintiffs submitted the 4(d) Petition, Plaintiffs have yet to receive a response.

8.    Plaintiffs' 2016 Petitions were spurred by likely leopard population declines and habitat loss coupled with ongoing threats to leopards from persecution, habitat fragmentation, an increase in illegal wildlife trade, excessive take for ceremonial use of skins, prey base declines, and poorly managed trophy hunting. Recognizing that the United States is the top importer of leopard specimens sourced from the wild—with the vast majority of this trade consisting of leopard hunting trophies—the Petitions focused on the threat to African leopards from poorly managed trophy hunting that is fueled by U.S. demand.



*African leopard, Uganda 2018. Photo by Brett Hartl*

9.      Uplisting threatened leopards to endangered status would ensure that the ESA's more protective permitting requirements apply to all leopard hunting trophy imports, while rescinding the 4(d) rule, specifically its exemption for hunting trophies, would accomplish the same objective.

10.     The Service is in violation of both the ESA and the APA. Through this Complaint, Plaintiffs seek to compel the Service to (1) issue a 12-month finding on Plaintiffs' Uplisting Petition by a date certain and (2) substantively respond to Plaintiffs' 4(d) Petition by a date certain. Plaintiffs also seek their fees and costs associated with this litigation and such other relief as may be necessary.

## JURISDICTION AND VENUE

11.     This action arises under the ESA, 16 U.S.C. §§ 1531–1544, and the APA, 5 U.S.C. §§ 551–559, 701–706, and relief is appropriately awarded under the ESA, 16 U.S.C. § 1540(g); the APA, 5 U.S.C. § 706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 (declaratory and injunctive relief); the Equal Access to Justice Act, 28 U.S.C. § 2412; and the Court's equitable powers.

12.     The Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c), (g)(1)(C) (actions arising under the ESA citizen suit provision), 5 U.S.C. § 702 (actions for those adversely affected by agency action under the APA), 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1346 (actions against the United States).

13.     As required by section 11(g) of the ESA, on October 28, 2020, Plaintiffs provided Defendants with written notice of their intent to file this suit pursuant to the ESA's citizen suit provision. 16 U.S.C. § 1540(g)(2)(C).

14.     Defendant Secretary of the Interior (then David Bernhardt, now Debra Haaland) received Plaintiffs' notice letter by email on October 28, 2020, and by first class, certified mail on November 2, 2020.

15.     Defendant U.S. Fish and Wildlife Service received Plaintiffs' notice letter, directed to then-Director of the U.S. Fish and Wildlife Service Aurelia Skipwith, by email on October 28, 2020, and by first class, certified mail on November 2, 2020.

16.     On December 18, 2020, the Service sent Plaintiffs a letter responding to Plaintiffs' notice letter but declining to immediately make a 12-month finding on Plaintiffs' Uplisting Petition, or to provide Plaintiffs with a date by which the Service intended to make such a finding or respond to Plaintiffs' 4(d) Petition.

17.     Defendants have not remedied their continuing ESA and APA violations as of the date of this Complaint. Therefore, an actual controversy exists between the parties under 28 U.S.C. § 2201(a).

18.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A), as this civil action is brought against officers and employees of the United States acting in their official capacities and under the color of legal authority; a substantial part of the events giving rise to Plaintiffs' claim occurred in the District of Columbia; Defendants are headquartered in this district; Plaintiffs Humane Society International and the Humane Society of the United States are headquartered in the District of Columbia; and no real property is involved in the action.

19.     The ESA and APA provide waivers of the federal government's sovereign immunity. 16 U.S.C. § 1540(g); 5 U.S.C. § 702.

## PARTIES

### A.    Plaintiffs

20.    Plaintiff Humane Society International ("HSI") is a global nonprofit organization, headquartered in Washington, DC, with offices and programs around the world, including in Africa. HSI works to protect animals from abuse and exploitation, including wildlife trafficking and trophy hunting, and has expended substantial organizational resources advocating for increased international and domestic legal protections for African leopards. HSI actively advocates at the state, federal, foreign, and international levels against unsustainable trade in wildlife parts and products and regularly monitors the import and export of wildlife specimens, including hunting trophies of leopards and other African wildlife species. As an observer at the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), HSI works to ensure that leopard trophy export quotas are scientifically based and that bones of leopards and other big cats do not enter commercial trade to supplement trafficking in tiger bones. HSI also advocates for the improvement of management and protections of leopards and other wildlife species in range states. For example, HSI provides comments and other input to the South African government regarding that country's setting of leopard hunting quotas, review of leopard populations and trade information, and process for managing so-called "problem" leopards. The recreational killing of leopards by hunters, including for import into the United States, undermines HSI's efforts to protect leopards by normalizing lethal activities and creating cascading obstacles for leopard conservation. HSI is a co-petitioner on the Uplisting Petition and the 4(d) Petition.

21.    Plaintiff the Humane Society of the United States ("HSUS") is a nonprofit organization headquartered in Washington, DC. HSUS is the nation's largest animal protection organization, with millions of members and supporters. HSUS' mission is to fight to end suffering

for all animals. In furtherance of this mission, HSUS has worked for decades to improve the plight of African wildlife on behalf of its members who are personally vested in ensuring the continued survival of some of the world's most iconic imperiled species. For example, HSUS petitioned the Service to list African elephants, African lions, African leopards, and chimpanzees as endangered under the ESA to curtail the importation of hunting trophies and domestic trade of such wildlife, and HSUS has commented in opposition to hundreds of permit applications to import endangered species trophies from Africa and other regions or to kill endangered domestic species. HSUS is a co-petitioner on the Uplisting Petition and the 4(d) Petition.

22.     Plaintiff the Center for Biological Diversity ("Center") is a 501(c)(3) nonprofit corporation incorporated in the State of California with its headquarters in Tucson, Arizona. The Center maintains offices throughout the United States, including in the District of Columbia, California, Arizona, Florida, Oregon, North Carolina, Washington, and other U.S. states, and in Baja California Sur, Mexico. The Center has more than 89,000 members and more than 1.7 million online supporters. The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center's International Program works to protect global biodiversity by using U.S. and international law to hold governments accountable for threatening imperiled species wherever they are found. In pursuit of this mission, the Center has been actively involved in securing protections for foreign species, including African leopards. In addition to being a co-petitioner on the Uplisting Petition and the 4(d) Petition, the Center has also worked internationally to help garner support for listing leopards under the Convention on Migratory Species and supported the African Carnivore Initiative. At CITES meetings, the Center has worked as an observer to advocate for scientifically sound leopard export quotas and to ensure species listed on Appendix I of CITES are adequately protected. The

Center also works to curtail the trophy hunting of species threatened with extinction by petitioning for ESA protections for species and through advocacy before federal agencies, among other actions.

23.    Plaintiffs' organizations, members, and supporters include individuals who enjoy observing, photographing, filming, and otherwise appreciating wild African leopards and their habitat. These individuals derive professional, scientific, educational, recreational, aesthetic, moral, spiritual, and other benefits from African leopards in the wild and their habitat. Plaintiffs have members who have visited and have concrete plans to again visit African leopard habitat, including in or near areas where trophy hunting occurs.

24.    Plaintiffs and their members and supporters recognize the ongoing threat trophy hunting, including poorly managed trophy hunting, has on African leopard populations in countries where such hunting is permitted. Plaintiffs' members devote substantial recreational time to viewing, hearing, enjoying, studying, photographing, searching for, and observing leopards and signs of leopards in countries where the species is listed as threatened under the ESA. Plaintiffs' and their members' interests are harmed by the threatened listing and leopard 4(d) rule, which insulate threatened leopard trophy imports from the ESA's protective enhancement standard. Coupled with the lax implementation of CITES protections for leopards, the limited ESA protections that threatened African leopards receive result in: an increased number of leopards being killed for recreational purposes for import into the United States; cascading population effects leading to decreased leopard abundance; unsustainable pressure on leopard populations; and poor oversight of the management of leopard trophy hunting in range countries. Thus, the lack of full ESA protections diminishes Plaintiffs' members' ability to enjoy these majestic animals in the wild.

25.     For example, HSUS member Heidi Osterman visits Zambia regularly, including in 2015, 2016, 2018, 2019, and 2021 due in part to her significant volunteer work for a philanthropic conservation organization that leads wildlife viewing safaris in South Luangwa National Park and provides conservation education to the public as well as water to communities surrounding the park. She has also participated in observing and tracking collared animals with an organization in Zambia that is dedicated to monitoring and conserving leopards and other native large carnivores. Ms. Osterman has seen leopards several times on her past safaris in South Luangwa National Park, and the leopard is one of the species she most enjoys seeing in the wild. Ms. Osterman most recently traveled to Zambia and Kenya from August 19 through September 4, 2021, where she enjoyed viewing leopards and other wildlife. She has concrete plans to continue to return to African countries, including Zambia, to view and photograph leopards and other wildlife; Ms. Osterman and her husband have already booked a wildlife-viewing safari in Zambia scheduled for March 2022. Trophy hunting of leopards harms Ms. Osterman due to the expansive and detrimental impacts the practice has on leopard populations, lessening her ability to view and enjoy these animals in the wild. Her enjoyment is further hampered when she knows that trophy hunters could be impacting the leopard populations that she seeks to enjoy. Additionally, the presence of trophy hunters in areas where Ms. Osterman observes leopards harms her aesthetic enjoyment of leopards.

26.     HSUS member Iris Ho has devoted her career to protecting and conserving foreign wildlife, such as leopards, from unsustainable trophy hunting and other threats to the species. Ms. Ho worked on wildlife conservation issues for HSI from 2010 until October of this year and now works for a nonprofit organization dedicated to rescuing, caring for, and advocating on behalf of African wildlife. In addition to her work on wildlife conservation, Ms. Ho serves on the board of directors for a wildlife conservation organization in Tanzania. For many years, she has worked

closely with a nonprofit organization, which leads philanthropic wildlife viewing safaris in the Luangwa Valley in South Luangwa National Park in Zambia, to secure, enforce, and implement protections against wildlife trafficking. Ms. Ho visited Africa many times between 2015 and 2020, including Tanzania, Zambia, Kenya, and South Africa, where she went on wildlife viewing safaris to see leopards and other species. For example, Ms. Ho has personally viewed wild leopards in South Luangwa National Park in Zambia and the Selous Game Reserve, Serengeti National Park, and Ngorogoro Conservation Area in Tanzania. While Ms. Ho is not currently traveling internationally due to the COVID-19 pandemic, she has plans to return to both Tanzania and Zambia to view leopards in the wild once it is safe to travel again, likely in 2022. She also plans to visit other African countries for work, in her new position. Trophy hunting of leopards harms Ms. Ho due to the cascading impacts the practice has on leopard populations, negatively impacting her ability to observe these animals in the wild. Additionally, her aesthetic enjoyment in viewing the species is diminished when she knows that trophy hunters could be impacting the leopard populations that she seeks to enjoy.

27.    HSUS member Audrey Delsink is the Wildlife Director of HSI in Africa and has a Doctorate of Philosophy in Biology. Dr. Delsink lives in South Africa and gains great personal fulfillment and aesthetic enjoyment from viewing, hearing, and photographing leopards and their habitat and from observing signs of leopards, including their tracks. From 1998 through 2016, she lived on a game reserve in South Africa, where seeing leopards in their natural habitat was a meaningful part of her life and work. In her current position, Dr. Delsink actively fights to protect leopards from trophy hunting and other threats both within South Africa and on the international level at CITES meetings, including providing comments and testimony on South Africa's proposal to imminently resume trophy hunting quotas. Since 2018, Dr. Delsink has annually traveled to

multiple game reserves within South Africa for work, and during these trips she takes time to look and listen for leopards. She also travels several times a year with her family to game reserves in South Africa to listen for, view, and attempt to view wildlife, including leopards. Dr. Delsink last went on one of these family vacations in August 2021, and last went on one of her work trips to four game reserves in South Africa in October 2021; she enjoyed hearing leopards on both trips but was unable to see any. She has concrete plans to continue her work and personal trips within South Africa at the same frequency. Dr. Delsink also traveled to Namibia in 2017, Malawi in 2018, and Kenya in 2019 for work and enjoyed looking for leopards during these trips. She has concrete plans to return to Namibia in late 2021 or in 2022, depending on when needed permits for the trip are secured, and she plans to travel to Malawi and Mozambique in 2022. When she travels for work or personal reasons, Dr. Delsink thoroughly enjoys viewing and photographing wildlife, including seeing, hearing, and observing signs of as many leopards as she can, although opportunities to find leopards in the wild are limited and she does not see them as frequently as she would like. Dr. Delsink's ability to view, hear, and observe signs of healthy leopard populations in the wild is harmed by trophy hunting because of the cascading effects the practice has on leopard populations. Additionally, the government of South Africa has recently announced its intention to reopen trophy hunting of leopards. Dr. Delsink is acutely aware that her ability to see, hear, and observe signs of leopards in the wild will further decrease if South Africa again opens its borders to trophy hunters from the United States, unless additional ESA protections are put in place for leopards in this area.

28.     By way of another example, Center employee Brett Hartl is a biologist and amateur naturalist who enjoys observing, photographing, and filming wildlife and their habitat around the world. Mr. Hartl enjoys viewing leopards and has captured detailed photographs of them in

Uganda, Tanzania, and Namibia as well as in Asia. Mr. Hartl first visited Africa in 2010 on a two-week safari in Tanzania, where he visited Serengeti National Park, the Ngorogoro Conservation Area, and other national parks and became enchanted with the continent and its wildlife. He returned in 2015 on a trip to South Africa, Namibia, and Botswana, then visited Ghana in 2017, Uganda in 2018, and Kenya and the Central African Republic in 2019. In October 2021, he returned to South Africa to view and enjoy wildlife, including leopards. In 2023, he plans to return to Tanzania and to visit Zambia and Zimbabwe to view wildlife, including leopards. Mr. Hartl is harmed by the Service continuing to allow imports of African leopard trophies under the existing 4(d) rule. Leopard hunting by U.S. trophy hunters without application of the ESA's substantive requirements reduces the number of leopards available for Mr. Hartl to view, making it less likely he will be able to view leopards in the wild.

29.    Defendants' violations have directly, adversely, and irreparably harmed Plaintiffs and their members' interests in leopards. This harm is ongoing and will continue unless and until this Court provides the relief prayed for in this Complaint.

30.    The relief sought in this Complaint would redress Plaintiffs' injuries. Listing leopards as endangered throughout their range or rescinding the 4(d) rule to afford leopards full ESA section 9 protections throughout the species' range would provide leopards with important protections and benefits, particularly by ensuring that trade in leopard hunting trophies meets the ESA's protective enhancement standard. 16 U.S.C. §§ 1538(a), 1539(a)(1)(A). Endangered species listing also increases awareness of threats facing the species; stimulates research efforts to address conservation needs; and increases funding for conservation of species, including habitat conservation. Under the ESA, the Service provides financial assistance for programs to conserve

listed species in foreign countries, encourages conservation programs for such species, and offers other related assistance, such as personnel and training.

31.     Therefore, Plaintiffs and their members are injured by Defendants' failure to make timely decisions under the ESA and APA on Plaintiffs' Petitions. Defendants' protracted failure to act prevents the application of the ESA's substantive protections to the leopard trophy trade, when this practice is a known threat to the species, populations of which are thought to be declining. These are actual, concrete injuries from which Plaintiffs and their members presently suffer; are directly caused by Defendants' acts and omissions; and will continue to occur unless the Court grants relief. The relief sought herein would redress these injuries. Plaintiffs and their members have no other adequate remedy at law.

**B.     Defendants**

32.     Defendant Debra Haaland is the Secretary of the U.S. Department of the Interior. In this capacity, Secretary Haaland directs all business of the Department of the Interior. Pursuant to the ESA, Secretary Haaland is responsible for determining whether species are endangered or threatened; promulgating regulations to list, adopt, or modify ESA listings; establishing or rescinding 4(d) rules; and otherwise protecting those species. In her official capacity, Secretary Haaland is responsible for the violations alleged in this Complaint.

33.     Defendant U.S. Fish and Wildlife Service ("FWS") is an agency within the Department of the Interior. The Secretary of the Interior has delegated to FWS the authority to administer the ESA for many species of wildlife, including the responsibility of complying with the ESA's mandatory listing deadlines and responding to petitions for amendment or rescission of 4(d) rules. 50 C.F.R. § 402.01(b). This authority encompasses proposed and final listing decisions and any accompanying 4(d) rule for the leopard.

## STATUTORY BACKGROUND

### A.    The Endangered Species Act

34.    The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, provides protections for both domestic and foreign endangered and threatened species.

35.    In passing the ESA, Congress found that "various species . . . have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation" and "other species . . . have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(1)–(2).  Accordingly, the purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." *Id*. § 1531(b).

36.    To this end, section 4 of the ESA requires the Service to protect imperiled species by listing them as either "endangered" or "threatened." 16 U.S.C. § 1533(a).

37.    A "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). An "endangered species" is any species that "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A "threatened species" is any species that "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

38.    The Service must list a species under the ESA if the species is endangered or threatened due to "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational

purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1).

40. The Service must make listing determinations "solely on the basis of the best available scientific and commercial information regarding a species' status." 50 C.F.R. § 424.11(b); *see also* 16 U.S.C. § 1533(b)(1)(A).

40. Once a species is listed, the ESA's conservation measures apply to protect it.

41. Endangered species are automatically protected under section 9 of the ESA, which includes a prohibition on the import, export, and interstate commerce in endangered species or attempts to engage therein, 16 U.S.C. § 1538(a)(1)(A), (D)–(G), (g), unless such activity is "for scientific purposes or to enhance the propagation or survival of the affected species," *id.* § 1539(a)(1)(A).

42. Under section 4(d) of the ESA, the Service must issue regulations to conserve threatened species and may extend to them the statutory protections afforded to endangered species by section 9. 16 U.S.C. § 1533(d).

43. The ESA provides for "international cooperation" in the conservation of foreign species. 16 U.S.C. § 1537. According to the Service, the listing of foreign species also provides for "increased awareness of listed species, research efforts to address conservation needs, or funding for in-situ conservation of the species in its range countries." The agency has further explained that listing provides funding for management programs developed to conserve listed species and to encourage development of conservation programs for listed species as well as capacity building programs.

44. To ensure the timely protection of species at risk, Congress set forth a detailed process whereby citizens may petition the Service to add a species to the endangered or threatened

lists, including by changing the listed status of a species, and set specific deadlines for the Service to respond to such petitions. 16 U.S.C. § 1533(b)(3); 50 C.F.R. § 424.14; *see also* 50 C.F.R. § 424.10 (Service may "change the listed status of a species" in accordance with relevant listing procedures, including 50 C.F.R. § 424.14).

45.    The petition process includes nondiscretionary deadlines so that species in need of protection receive the ESA's substantive protections in a timely fashion. The ESA requires three findings on petitions that warrant action: a 90-day finding, a 12-month finding, and a final listing determination.

46.    Upon receipt of a petition to list or change the listed status of a species, the Service must, "[t]o the maximum extent practicable," make an initial finding "within 90 days" as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). This is referred to as a "90-day finding."

47.    If the Service finds that a petition does not present substantial information indicating that listing may be warranted, the agency must publish that finding, and the petition is rejected. 50 C.F.R. § 424.14(h)(1).

48.    If, on the other hand, the Service determines that a petition presents substantial information indicating that listing may be warranted, the agency must publish that finding and conduct a full scientific review of the species' status, which is known as a "status review." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). Then, within 12 months of receiving the petition, the Service must make a finding that: (1) listing is "warranted;" (2) listing is "not warranted;" or (3) listing is "warranted but . . . precluded" by other pending listing proposals,

provided certain requirements are met. 16 U.S.C. § 1533(b)(3)(B). This decision is referred to as a "12-month finding."

49.    If the Service's 12-month finding concludes that listing is warranted, the agency must "promptly publish" notice of a proposed regulation to list the species as endangered or threatened in the Federal Register for public comment. 16 U.S.C. § 1533(b)(3)(B)(ii). Within one year of publication of the proposed regulation, the ESA requires the Service to render its final determination on the proposal. *Id.* § 1533(b)(6)(A). This is known as a "final listing determination." At such time, the Service must either list the species, withdraw the proposed listing rule, or if there is substantial disagreement about scientific data, delay a final determination for up to six months to solicit additional scientific information. *Id.* § 1533(b)(6)(A)(i), (B)(i).

50.    Once a species is listed, a person cannot engage in conduct prohibited by section 9 or a 4(d) rule unless the person receives a permit under section 10. Such permits can only be issued in limited circumstances, such as to "enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A).

51.    The legislative history of the ESA clarifies that the issuance of enhancement permits was intended to be extremely limited in scope and that it would only allow an otherwise strictly prohibited activity where necessary to benefit the species in the wild. *See, e.g.*, H.R. Rep. No. 93-412,  (1973), *reprinted in* Cong. Research Serv., A Legislative History of the Endangered Species Act of 1973 (1982), at 156 ("[a]ny such activities to encourage propagation or survival may take place in captivity, in a controlled habitat or even in an uncontrolled habitat so long as this is found to provide the most practicable and realistic opportunity to encourage the development of the species concerned").

52.     In issuing enhancement permits, the Service generally considers factors such as: "[t]he probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;" "[w]hether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;" and "[w]hether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit." 50 C.F.R. § 17.22(a)(2).

53.     These same factors generally apply to threatened species as well as endangered species. 50 C.F.R. § 17.32(a)(2).

**B.     The Administrative Procedure Act**

54.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, provides for judicial review of final agency action, including agency inaction, by persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702.

55.     The APA requires that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

56.     The APA further requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it," 5 U.S.C. § 555(b), and that agencies give "prompt notice" if they deny a petition, providing "a brief statement of the grounds for denial." *Id.* § 555(e).

57.     Any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," has a cause of action under the APA. 5 U.S.C. § 702.

58.     Agency action includes an agency's "failure to act." 5 U.S.C. § 551(13).

59.    The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

**C.    Convention on International Trade in Endangered Species**

60.    The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") is an international treaty governing trade in imperiled species of wildlife and plants. CITES, Mar. 3, 1973, 27 U.S.T. 1087. CITES recognizes that "wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems" and that "international cooperation is essential for the protection of [these] species . . . against over-exploitation through international trade." *Id.*, Preamble.

61.    To receive protection under CITES, species must be included on one of the three CITES Appendices, and each Appendix provides listed species varying degrees of protection.

62.    Species on Appendix I of CITES are "threatened with extinction," CITES art. II, ¶ 1, and are afforded the strictest protections available under CITES. CITES bans all commercial, international trade in Appendix-I species, although non-commercial trade for scientific, zoological, and other limited purposes may still occur with proper permitting. CITES, art. III, ¶¶ 1–3.

63.    Leopards are listed on CITES Appendix I.

64.    To issue a CITES import permit for a leopard trophy, an importing country, such as the United States, must find that: (1) "the import will be for purposes which are not detrimental to the survival of the species involved" (a "non-detriment finding"); and (2) "the specimen is not to be used for primarily commercial purposes." CITES, art. III, ¶ 3.

65.    In making non-detriment findings under CITES, governments are advised to consider a number of different factors, including: "the volume of legal and illegal trade (known, inferred, projected, estimated) relative to the vulnerability of the species;" "the implementation of

adaptive management, including monitoring, is an important consideration in the making of a non-detriment finding;" and the species' biology, life history, range, population structure, status, trends, threats, levels and patterns of harvest and mortality "from all sources combined," management measures, and compliance. CITES, *Non-detriment findings*, Resolution Conf. 16.7 (Rev. CoP17).

66.     CITES Parties typically treat the export and import of hunting trophies as non-commercial trade since the transaction is acquisition for personal home display (i.e., non-commercial purposes), even though the nature of the acquisition of the specimen may be commercial. 50 C.F.R. § 23.62(c)(1).

67.     In the United States, the Service implements CITES pursuant to the ESA and the Service's CITES regulations. 16 U.S.C. §§ 1537a, 1538; 50 C.F.R. §§ 23.1–23.92.

## FACTUAL BACKGROUND

### A.     Leopards

68.     Iconic leopards are best known for their spotted coats, but they are also revered for their stealth and strength as predators, as they are known to haul their prey into trees.



*African leopard, Zambia 2016. Photo by Heidi Osterman*

69.    Leopards can reach speeds of 60 kilometers per hour, with horizontal leaps of 6 meters and vertical leaps of 3 meters.

70.    The leopard was once the most widely distributed wild cat in the world, occurring from Asia to Africa.

71.    In 2016, the International Union for the Conservation of Nature ("IUCN") published an assessment determining that the leopard species, as a whole, is vulnerable to extinction, finding the species had lost 30% of suitable range worldwide and noting the difficulties in estimating, let alone establishing trends for, leopard populations.

72.    Observing that "[e]vidence suggests that Leopard populations have been dramatically reduced," the IUCN concluded leopards are vulnerable to extinction due to habitat fragmentation, prey depletion, retaliatory killing for livestock depredation, illegal skin trade, and poorly regulated trophy hunting.

### B.    African Leopards

73.    The African leopard (*Panthera pardus pardus*) is a recognized subspecies of leopard with a low reproductive rate averaging two cubs per litter, of which 63% die prior to independence from their mother.

74.    The leopard species, in all parts of its range, was originally listed as endangered under the ESA. List of Endangered Foreign Fish and Wildlife, 37 Fed. Reg. 6,476 (Mar. 30, 1972).

75.    In 1982, however, the Service downlisted African leopards to threatened in an arbitrary portion of their range. Endangered and Threatened Wildlife and Plants; Threatened Status for the Leopard in Southern Africa, 47 Fed. Reg. 4,204 (Jan. 28, 1982); 50 C.F.R. § 17.11 (leopard listed as a threatened species "[i]n Africa, in the wild, south of, and including, the following countries: Gabon, Congo [now, Republic of the Congo], Zaire [now, Democratic Republic of the

Congo], Uganda, Kenya"). To date, leopards are listed as threatened in 18 African countries extending along a line from Africa's west to east coast and then south through South Africa are listed as threatened under the ESA. The Service's division of the African leopard population in this way does not comport with any commonly recognized scientific delineation of the subspecies.



*Map depicting the line under which leopards are listed as threatened.*

76.     While the Service may list a species or subspecies as threatened in some parts of its range and endangered in others, it must do so by designating a "distinct population segment," which includes scientific findings that the segment of the population is both "discrete" and "significant." *See* 16 U.S.C. § 1532(16); Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996). The Service did not undertake such an analysis when listing African leopards as threatened and endangered in different portions of their range, nor has it ever undertaken such an analysis for the African leopard subspecies or segments thereof.

77.     A 4(d) rule applies to leopards listed as threatened. 50 C.F.R. § 17.40(f)(1).

78.     While the Service refers to this geographic area as "southern Africa," 50 C.F.R. § 17.40(f)(1), most scientists—including IUCN in its leopard assessment—define southern Africa to include a narrower range of countries, specifically Angola, Zambia, Zimbabwe, Mozambique, Namibia, Botswana, and South Africa. Some of the countries included within the Service's definition of "southern Africa" are included in the IUCN's definition of "East Africa," specifically Kenya and Tanzania, and others are in "Central Africa," such as Gabon and the Democratic Republic of Congo.

79.     Under the ESA, 4(d) rules must provide for a species' conservation and may extend the statutory prohibitions in section 9 to threatened species. 16 U.S.C. § 1533(d). The leopard 4(d) rule extends all of the ESA's protections in section 9 to threatened leopards, except that it exempts hunting trophies from section 9's import prohibition. Because of this exemption, a section 10 "enhancement of propagation or survival" of the species permit is *not* required to import a trophy obtained by killing a threatened leopard. *See* 50 C.F.R § 17.40(f). Instead, under the 4(d) rule, hunting trophies of threatened leopards need only comply with the Service's CITES implementing regulations to be imported into the United States. *Id.* In other words, the permit need only conclude the import of the trophy is *not detrimental to* the species' survival, not that it *enhances* the species' survival.

80.     In 2016, IUCN raised dire concerns regarding the status of leopards, explaining that while there are few reliable population data for African leopards, "there is compelling evidence that subpopulations have likely declined considerably" in Africa. The IUCN assessment also documented decreasing range availability and habitat fragmentation.

81.     The 2016 assessment concluded that leopards in sub-Saharan Africa likely suffered a 30% population decline over three generations (22.3 years) due to habitat loss and fragmentation,

prey base declines, increasing human populations, exploitation (e.g., from illegal trade, increased ceremonial use, and trophy hunting), and persecution.

82.    The 2016 assessment specifically identified trophy hunting as a threat to the species despite the fact that leopards are listed on Appendix I of CITES and have CITES-approved quotas for trade in hunting trophies.

**C.    Leopards Currently Listed as Threatened Should be Listed as Endangered**

83.     IUCN has documented a precipitous deterioration of the status of the leopard over the past 15 years: in 2002, the species was considered Least Concern; in 2008, Near Threatened; and in 2016, Vulnerable.

84.    In light of the threats to the African subspecies and likely population and range losses, Plaintiffs petitioned the Service to uplist threatened leopards to endangered or rescind the 4(d) rule to ensure all of section 9's prohibitions fully apply throughout the entirety of their range.

**1.    Habitat loss and destruction**

85.    African leopards are imperiled due to the ongoing loss and fragmentation of their habitat and declining prey base.

86.    IUCN documented a dramatic reduction in west African leopard distribution, range decline in central Africa, and a reduction in leopard range in east Africa. While southern Africa, as defined by IUCN, was once thought to be a leopard stronghold, IUCN documented a 21% range loss there and found "no evidence to suggest that Leopard populations have remained stable" in the south. Prey depletion is also increasing due to increasing human populations and commercial bushmeat harvest. The latter has caused an estimated 59% average decline in leopard prey populations in 78 protected areas in west, east, and southern Africa between 1970 and 2005.

### 2.    Overuse for commercial and recreational purposes

87.    Leopards are over-utilized for commercial and recreational purposes. Leopards are threatened by trophy hunting, particularly when it is poorly managed and puts pressure on local populations, concentrates trophy hunting geographically, or targets individuals in their prime, who are territorial and reproductively active. Leopard trophy hunting also has cascading impacts on leopard populations. For example, trophy hunting of territorial males leads to infanticide of cubs and increased leopard conflicts as new or different males immigrate to replace those killed by trophy hunters. Female leopards are also trophy hunted, both legally and illegally, which has an additive effect on the population due to females' critical reproductive capacity and because cubs likely also die when their mothers are killed.

88.    As an importer, the United States plays a crucial role in the international leopard hunting trophy trade. From 2005 to 2014, the United States imported almost half of all leopards specimens traded internationally for hunting trophy purposes (6,695 or 48.8%), with no other country coming close to the number of U.S. imports. Since that time, U.S. imports have increased. From 2014 to 2018, the United States imported, on average, 52% of all such specimens. The Service continues to grant CITES permits for U.S. trophy hunters to import African leopard trophies from various African countries under the CITES' non-detriment standard, which is less stringent than the ESA's enhancement standard.

89.    Leopards are also threatened by illegal trade in their skins. Retaliatory killings of leopards for livestock loss further endanger the species. Indiscriminate killings, including by poisoning or snares set to kill other species, pose additional threats to leopards' survival.

### 3.    Predation and Disease

90.    Leopards are generally not subject to predation except from their own kind. For example, when a territorial male is killed, such as from trophy hunting, this creates conflict between other males that migrate into the territory and leads to infanticide.

91.    Disease may now be a threat to leopards as several big cat species in captivity at zoos—including lions, tigers, and snow leopards—have contracted the SARS-CoV-2 virus that causes COVID-19. These infections raise concerns that leopards may be susceptible to the virus as well.

### 4.    Inadequate existing regulatory mechanisms

92.    Regulatory protections that apply to leopards have not been adequate to stem their decline from Least Concern in 2002 to Vulnerable in 2016, according to IUCN Red List assessments.

93.    The current ESA threatened listing of African leopards in certain portions of their range is not adequately protecting these leopards from poorly managed trophy hunting. Further, the line the Service has drawn between threatened and endangered leopards is arbitrarily based on geo-political boundaries rather than science. Thus, the current ESA listing status for leopards is inadequately protecting the African subspecies.

94.    Under the current leopard 4(d) rule, no ESA import permit is required for hunting trophies of leopards listed as threatened, so the Service is not required to issue a section 10 enhancement permit for such trophies to be imported into the United States. 50 C.F.R § 17.40(f). However, the ESA requires that 4(d) rules provide for the species' conservation. 16 U.S.C. § 1533(d); *Sierra Club v. Clark*, 755 F.2d 608 (8th Cir. 1985); *see also* 16 U.S.C. §§ 1531(b) (the primary purpose of the ESA is to "provide a program for the conservation of such endangered

species"), 1532(3) (the term "conservation" means "to use . . . all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary"). Given the threat trophy hunting poses to leopards, the existing regulatory scheme for leopards under the ESA is failing to adequately conserve them.

95.    Leopards were listed on Appendix I of CITES on February 4, 1977. While Appendix I listings generally foreclose commercial trade and require that any remaining trade not be detrimental to the species' survival, leopards have CITES-approved export quotas for the hunting trophy and skin trade. These quotas are unsustainable and unscientific. Although the quotas are theoretically supposed to protect against detrimental trophy trade, recent IUCN assessments of African leopards identify poorly managed trophy hunting as a threat to the species, demonstrating the quotas are not serving their intended function.

96.    Leopards are listed on Appendix II of the Convention on Migratory Species ("CMS"). This listing does not provide on-the-ground protections for leopards. *See* CMS art. IV, ¶ 1, June 23, 1979, 1651 U.N.T.S. 333. Instead, CMS Parties are encouraged to adopt agreements for Appendix II species with the goal of recovering them to a favorable conservation status. CMS art. IV, ¶ 3; *id.* art. V, ¶ 1. Currently, parties to CMS and CITES are working on creating a joint African Carnivore Initiative that includes leopards, but the joint work program is still being developed.

**D.    Plaintiffs' Petitions and Defendants' Failure to Act**

97.    Recognizing the perils leopards face due to overutilization, international trade, habitat destruction, and inadequate regulatory mechanisms, and due to the harmful impacts of trophy hunting fueled in large part by U.S. demand, Plaintiffs submitted Petitions on July 25, 2016.

Those Petitions sought to (1) list all leopards as endangered under the ESA and (2) rescind the 4(d) rule to require ESA permits for all activities otherwise prohibited under the ESA, including importation of threatened leopard hunting trophies. Plaintiffs submitted these Petitions as a single document, providing alternate paths for the Service to afford the species the protections it desperately needs.

98.    When Plaintiffs submitted their Petitions and up until 2019, the Service had a blanket 4(d) rule that automatically applied all section 9 protections (e.g., the prohibitions on import, export, and interstate commerce) to all threatened species, unless the agency adopted a species-specific 4(d) rule, like the one adopted for leopards. *See* 50 C.F.R. § 17.31 (2018). In 2019, the Service amended its regulations to prospectively remove the blanket 4(d) rule. Endangered and Threatened Wildlife and Plants; Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44,753 (Aug. 27, 2019). Currently, 50 C.F.R. § 17.31 requires the Service to craft species-specific 4(d) rules for all species newly listed or reclassified as threatened but maintains the blanket 4(d) regulation for species listed as threatened *prior to* the 2019 regulatory change. 50 C.F.R. § 17.31(a); 84 Fed. Reg. at 44,753. In 2021, the Service indicated its intention to undertake rulemaking to reinstate the blanket 4(d) rule.

99.    Leopards should receive full section 9 protections if the leopard 4(d) rule were rescinded, since leopards were listed as threatened in 1982 and the blanket 4(d) rule continues to apply to species listed as threatened prior to September 2019. *See* 50 C.F.R. § 17.31(a).

100.    Plaintiffs' 4(d) Petition requested that the Service apply section 9's full suite of protections to all African leopards—including rescinding the exemption for hunting trophy imports—and Plaintiffs continue to seek a response to that request, regardless of the 2019 regulatory changes.

101.    The Service issued a positive 90-day finding on the Uplisting Petition on November 30, 2016, in which it determined that reclassifying the leopard as endangered throughout its entire range may be warranted due to the factors identified in the petition. 81 Fed. Reg. at 86,317.

102.    More than five years have passed since Plaintiffs filed their 2016 Petitions, but the Service has not issued a 12-month finding on Plaintiffs' Uplisting Petition. Nor has the Service acted on Plaintiffs' 4(d) Petition or otherwise provided any response to that petition.

103.    In its foreign species workplan, the Service outlines, as non-binding timelines, the fiscal year in which the agency intends to take listing actions for foreign species, which include 12-month findings, proposed listing rules, and final listing rules.

104.    Since the date that Plaintiffs filed the Uplisting Petition, the Service has taken few listing actions for foreign species.

105.    The agency issued its foreign species workplan in 2020 ("2020 Workplan"). In the fall of 2021, the Service issued a revised foreign species workplan ("2021 Workplan") which, among other things, pushes back the Service's non-binding timelines for completing listing actions for several species.

106.    The Service has already failed to meet numerous timelines in these workplans for Fiscals Years 2020 and 2021 (which ended on September 30, 2020 and September 30, 2021 respectively).

107.    As of the date of this Complaint, the Service still has not completed multiple foreign species listing actions it planned to undertake in Fiscal Year 2021.

108.    The Service has not identified *any* non-binding timeline by which it intends to issue its required 12-month finding on Plaintiffs' Uplisting Petition for leopards in either the 2020 Workplan or the 2021 Workplan.

109.    The Service's failure to meet its own non-binding timelines coupled with its failure to even identify a timeline for taking action on leopards demonstrate that a court order is required to ensure that a date certain is set for the Service to make the 12-month finding on Plaintiffs' Uplisting Petition. For the same reasons, a court order is required to ensure that a date certain is set for the Service to make a determination on Plaintiffs' 4(d) Petition.

110.    In the past, the Service undertook foreign species listing actions at a significantly faster annual pace but has significantly slowed its pace in recent years—despite no significant budgetary changes. Given the Service's demonstrated ability to take foreign species listing actions at a faster pace, it is practicable for the agency to expeditiously act on Plaintiffs' Uplisting Petition.

111.    It is necessary for this Court to order the Service to act expeditiously by a date certain on both Petitions given the threats posed to leopards—including by trophy hunting driven in large part by the U.S. market—and given the Service's inability to stick to its own timelines or independently act on Plaintiffs' Petitions.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the Endangered Species Act (16 U.S.C. § 1533(b)(3)(B))
Failure to Make a 12-Month Finding for Uplisting Threatened Leopards**

112.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth below.

113.    Defendants' protracted and ongoing failure to make the statutorily required 12-month finding on Plaintiffs' Uplisting Petition to reclassify all leopards as endangered violates the Endangered Species Act and its implementing regulations. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(h)(2).

114.    Plaintiffs and their members are injured by Defendants' continued failure to issue the required 12-month finding, and their injuries would be redressed if this Court grants Plaintiffs' requested relief.

## SECOND CLAIM

### Violations of the Administrative Procedure Act (5 U.S.C. § 555(b))
### Failure to Act on Petition to Rescind Trophy Hunting Exemption in Leopard 4(d) Rule

115.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth below.

116.    The Service's protracted and ongoing failure to respond to Plaintiffs' 4(d) Petition to rescind the 4(d) rule exempting leopard trophy imports from certain parts of Africa from the ESA's permitting requirements violates the APA. This failure constitutes an agency action "unlawfully withheld or unreasonably delayed" in violation of the APA. 5 U.S.C. §§ 555(b), 706(1).

117.    Plaintiffs and their members are injured by Defendants' continued failure to respond to their 4(d) Petition to rescind the leopard 4(d) rule allowing the importation, without an ESA permit, of leopard trophies from parts of Africa in which the leopard is listed as threatened, and their injuries would be redressed if this Court grants Plaintiffs' requested relief.

### REQUEST FOR RELIEF

Plaintiffs respectfully request this Court:

A.    Declare that Defendants violated the ESA by failing to issue a timely 12-month finding on Plaintiffs' Uplisting Petition to reclassify all leopards as endangered, 16 U.S.C. § 1533(b)(3)(B);

B.    Declare that Defendants violated the APA by failing to respond to Plaintiffs' 4(d) Petition to rescind the 4(d) rule allowing the importation, without an ESA permit, of leopard

trophies from parts of Africa in which the leopard is listed as threatened (50 C.F.R. § 17.40(f)(2)), 5 U.S.C. § 555(b);

C.    Order Defendants to issue, by a date certain, a finding as to whether reclassifying all leopards as endangered under the ESA is warranted;

D.    Order Defendants to respond, by a date certain, to Plaintiffs' 4(d) Petition to rescind the 4(d) rule allowing the importation, without an ESA permit, of leopard trophies from parts of Africa in which the leopard is listed as threatened (50 C.F.R. § 17.40(f)(2));

E.    Award Plaintiffs their attorneys' fees and costs in this action as provided by the ESA, 16 U.S.C. § 1540(g)(4), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.    Provide such other and further relief this Court deems just and proper.


Dated:  November 9, 2021                    Respectfully submitted,


                                            /s/ Laura Friend Smythe
                                            Laura Friend Smythe (D.D.C. Bar No. NY0217)
                                            Telephone: (202) 676-2331
                                            lsmythe@humanesociety.org
                                            Margaret Robinson (DC Bar No. 241415)
                                            Telephone: (202) 676-2369
                                            mrobinson@humanesociety.org
                                            The Humane Society of the United States
                                            1255 23rd Street, NW, Suite 450
                                            Washington, DC 20037

                                            Tanya Sanerib (DC Bar No. 473506)
                                            Telephone: (206) 379-7363
                                            tsanerib@biologicaldiversity.org
                                            Sarah Uhlemann (DC Bar No. 501328)
                                            Telephone: (206) 327-2344
                                            suhlemann@biologicaldiversity.org
                                            Center for Biological Diversity
                                            2400 NW 80th Street, #146
                                            Seattle, WA 98117

                                            *Counsel for Plaintiffs*